**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------X

UNITED STATES OF AMERICA,

                                24-CR-329 (MKB)

        v.

CARLOS ARTURO SUAREZ PALACIOS,

        Defendant.

---------------------------------------------------X

## <u>SENTENCING MEMORANDUM</u>
## <u>ON BEHALF OF CARLOS ARTURO SUAREZ PALACIOS</u>

Elena Fast, Esq.
The Fast Law Firm, P.C.
521 Fifth Avenue, 17 Floor
New York, New York 10175
Phone: (212) 729-9494
Email: elena@fastlawpc.com

Michael S. Perkins, Esq.
The Fast Law Firm, P.C.
521 Fifth Avenue, 17 Floor
New York, New York 10175
Phone: (212) 729-9494
Email: michael@fastlawpc.com

*Counsel for Carlos Arturo Suarez Palacios*

## I.    PRELIMINARY STATEMENT

Mr. Carlos Arturo Suarez Palacios (hereinafter "Mr. Suarez"), requests that this Court consider all the factors contained herein and decide on a sentence that is sufficient, but not greater than necessary, to accomplish the stated objectives found in 18 U.S.C. § 3553(a). The Defense respectfully submits that a sentence of five years of probation is sufficient, but not greater than necessary, to comply with the goals of sentencing.

## II.    PROCEDURAL HISTORY

On August 8, 2024, an Eastern District of New York Grand Jury returned an indictment against Mr. Suarez and his co-defendant Eliahou Paldiel. Dkt. 1. The two-count indictment charged the defendants with participating in a Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §1349 and §3551 et seq, and Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. §1956(h) and §3551 et seq. The Indictment alleged that from in or about November 2018 to July 2024, Mr. Suarez, together with others engaged in a scheme to defraud Rideshare Company-1,[1] specifically by permitting the drivers to manipulate or "spoof" their GPS location in order to obtain "surge fees" that they were otherwise not entitled to.[2] Dkt. 1 at   13.

On August 28, 2024, Mr. Suarez was arraigned before Hon. Magistrate Judge Marcia M. Henry and released on a partially secured bond. Dkt. 13. On October 7, 2025, pursuant to a written plea agreement, before Hon. U.S. District Court Judge Alleyne Ross, Mr. Suarez entered a plea of guilty to Count 1 of the Indictment - Conspiracy to Commit Wire Fraud, in violation of

---

[1] Through discovery, defense counsel ascertained that Uber is Rideshare Company-1.
[2] Although the indictment also alleged that the scheme deprived non-app-using drivers of the most valuable rides by taking surge bonuses, selecting the best rides by queuing up at the airport without physically being there,  these theories of prosecution were dismissed by Hon. Judge Ross on February 18, 2025 (Dkt. No 48).

18 U.S.C. §1349. Dkt. 64. On October 16, 2025, Mr. Suarez's case was reassigned to Your Honor. PSR    1. Mr. Suarez's sentencing is scheduled for April 30, 2026.

## III.    LEGAL STANDARD

Under 18 U.S.C. § 3553(a), sentences shall be "sufficient, but not greater than necessary" to achieve the basic goals of retribution, rehabilitation, specific and general deterrence. To arrive at such a sentence, district courts are directed to consider: (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the need for the sentence imposed to provide just punishment, deterrence, and needed educational and vocational training; (3) the kinds of sentences available; (4) the Guidelines-range and any pertinent policy statements issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (6) the need to provide restitution. *See* 18 U.S.C. § 3553(a). In every case, the sentencing court "must make an individual assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). Against the backdrop of these factors, Mr. Suarez respectfully submits that a variance is warranted in his case. Dkt. 1 at 15(a).

## IV.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

### A.  Drivers' Dissatisfaction with Uber

Uber promotes itself as a flexible way for drivers to work as independent contractors and make a good living. That is not the reality that many Uber drivers, including Mr. Suarez, have experienced. While Uber revolutionized the transportation industry by making it more accessible to drivers who were not constrained by the medallion limits imposed by the New York City Taxi and Limousine Commission, it did so at a cost to the drivers. Between 2005 and 2016, the

2

average income of for-hire vehicle drivers in the United States has decreased by 7.6%. Sicheng Wang & Michael Smart, *The Disruptive Effect of Ridesourcing Services on For-Hire Vehicle Drivers' Income and Employment*, 74 Transp. Res. Part A: Pol'y & Prac. 42 (2019). Further, "[a]s the supply of ridesourcing vehicles has increased exponentially, the income of ridesourcing drivers is threatened as well. Evidence suggests that Uber drivers earned 53% less in 2018 than they did in 2013." *Id*. Over time, Uber has altered its revenue-sharing formula with the drivers, "with Uber taking as much as 30 percent of gross fare revenue (depending on driver volume), up from 20 percent previously," resulting in a "significant reduction in the effective hourly rate that drivers could earn." David F. Larcker & Brian Tayan, *Governance Gone Wild: Misbehavior at Uber Technologies*, Harv. L. Sch. F. on Corp. Governance (Jan. 20, 2018).

All the while, overall driver satisfaction about their working conditions has been decreasing, with drivers believing that their "needs and expectations [being] overlooked by the platform." Peyman Ashkrof, Gonçalo Homem de Almeida Correia, Oded Cats & Bart van Arem, *Understanding Ride-Sourcing Drivers' Behaviour and Preferences: Insights from Focus Groups Analysis*, 37 Res. Transp. Bus. Mgmt. 100516 (2020).

### B.  The Inception of Mr. Suarez's Application

Initially, Mr. Suarez's intentions were to improve his own quality of life while driving for Uber. He began by developing an application that permitted Uber drivers to see the destination of the trip prior to accepting it. In the New York/New Jersey area during the time of the offense, Uber drivers were provided with "limited information about the prospective ride, such as the passenger rating, pick-up location, the general cardinal direction of the passenger's destination, and the 'surge amount,' if any, associated with the ride." Dkt. 1 ¶7.

The information about prospective rides made available to Uber drivers varies greatly depending on the geographic market. For instance, Uber has markets with "upfront fares" or "upfront trip details," where the drivers are able to see the destination of their rides. For example, in the "upfront fares" markets of Los Angeles, San Francisco, San Diego, Phoenix, Denver, Las Vegas, Houston, Atlanta and Chicago, Uber allows drivers to see a map of the route and the ride's payout, prior to accepting the ride. Prevailing driver sentiment is that this pre-acceptance information allows drivers to make informed decisions on which rides to accept. [3]

In contrast, in markets like New York, Uber has "blind destination" dispatching, where Uber drivers do *not* "receive certain information concerning the prospective ride—including its destination or fare—until after the driver accepts the ride. Prior to accepting the ride, the driver only has limited information about the prospective ride, such as the passenger rating, pick-up location, the surge associated with the ride, and the general cardinal direction of the passenger's Destination." PSR at ¶13.

Mr. Suarez's development of the "Screwber" application in the instant case was motivated by the desire to improve the quality of life for Mr. Suarez and the tens of thousands[4] of other Uber drivers in the New York/New Jersey market who were unable to see the passenger's destination. For example, an Uber driver residing in Suffolk County who accepts a ride from John F. Kennedy Airport would know that the ride is approximately 50 miles in distance, but the driver would *not* know whether the trip would bring the driver closer to his home in Suffolk

---

[3] https://therideshareguy.com/upfront-pricing-for-drivers/ ("You'll start seeing the fare, plus pickup and dropoff locations, right when you receive a request. This means that each time you get a request, it'll be easier to decide if it's worth your time and effort.")

[4] Data from the NYC Taxi & Limousine Commission indicates that Uber has dispatched at least 70,000 unique For-Hire Vehicles (FHV) in New York City every month since January 2024. *See* FHV Base Aggregate Monthly Report available at: https://www.nyc.gov/site/tlc/about/aggregated-reports.page

County or to Connecticut. Now imagine that same driver had intended that ride to be the final ride of their shift, but by accepting it without knowing the destination beforehand, the driver now finds themselves 50 miles from the airport and a further 40 miles away from their home in Hauppauge.

Mr. Suarez had firsthand experience with that very predicament when he was driving for Uber to earn supplemental income. See Defense Ex. A at 1. The fact that Uber drivers in the New York area "were required to accept ride requests without knowing the destination" created "real problems for [Mr. Suarez] . . . [because] an unexpected trip from New Jersey to New York City during peak hours could mean missing work" and "a trip to the airport could result in fines for dropping off the passenger due to lack of regulations." *Id.* at 4. This plight was Mr. Suarez's inspiration for developing what would be known as the Screwber App.

Mr. Suarez developed Screwber for the intended purpose of allowing drivers to access information about ride requests, specifically the passenger's destination and the approximate fare for that ride, that Uber did not ordinarily provide to prospective drivers. Dkt. 1 ¶15. The Screwber App "did so by accurately interpreting metadata that Uber itself communicated to prospective drivers, but that Uber did not expect or intend drivers to be able to decipher. With the assistance of . . . software, however, drivers were able to accurately decipher the metadata that Uber sent them and thus had a greater amount of truthful information relevant to their decision whether or not to accept a particular fare." *Paldiel Mot. to Dismiss*, Dkt. 31 at 2. Importantly, the App did not involve any intrusion or trespass of Uber's data, rather it passed the information already being sent to the drivers, but not being displayed on the Uber driver interface. Defense Exhibit A at 4.Additionally, Mr. Suarez did not operate the app off the books and instead paid taxes on the money earned.

C.  GPS Spoofing for Airport Queues and Fraudulent Surges

The Screwber App evolved from being a "destination" and approximate fare viewing platform, which was incredibly useful in a "blind destination" market like New York, to becoming coupled with the GPS "spoofing" or "Fake GPS" Application[5] that was used by drivers to "queue" at airports without being physically present.[6] Eventually, Fake GPS was misused and abused by a small proportion of Screwber drivers to steal surge bonuses (discussed in greater detail, *infra* at IV(D)). The Fake GPS Application could be used in a way that made it appear as if a driver was present in a "surge" area, when they were not. Using the Fake GPS app in such a manner could give a driver the ability to collect "surge" increases on rides that they were otherwise not entitled to. Eventually, some drivers began to use Fake GPS to "obtain surge pricing increases on rides to and from locations that were not actually 'surging.'" Dkt. 1 at ¶15. Out of all the theories of wire fraud prosecution charged in this case, this was the only one that survived the Motion to Dismiss.

While Mr. Suarez recognized that the Fake GPS App could be, and was, used by some drivers to fraudulently claim surge bonuses, he did not discontinue operating the App or build controls to prevent it; a decision he has very much come to regret every day since. Defense Exhibit A at 6. However, Mr. Suarez did not embark on this conduct with criminal intent; the App was developed in good faith to solve a tangible issue that was negatively affecting the quality of life of Mr. Suarez and the tens of thousands of Uber drivers in the NYC area.

---

[5] The "Fake GPS" application was not created by Mr. Suarez and was already being widely used by Uber drivers independent of Mr. Suarez's app.
[6] Both of these theories of wire fraud prosecution were dismissed by Hon. Judge Ross on February 18, 2025 (Dkt. No 48).

D. Prevalence of Obtaining Fraudulent Surges

For a license to use the Application, Mr. Suarez and Mr. Paldiel charged a $300 monthly fee to the subscribing drivers. PSR ¶21. The Defense has analyzed a spreadsheet provided by the U.S. Attorney's Office calculating the loss amount due to the fraudulently obtained surges as a result of GPS-spoofing.[7] Bates 53386. The Defense has reviewed the "By Trips" data which is the number of fraudulent surge rides that each individual driver took on a month-by-month basis. In analyzing the data, the Defense has learned that a small proportion of the individual drivers were abusing Fake GPS, thereby accounting for a disproportionate amount of the Total Surge Rides. *Id*. For example, of the 632 individual drivers that stole surges using Fake GPS, a mere 30 individual drivers accounted for over one third of the Total Surge Rides, while over half of the Total Surge Rides were accounted for by only 72 individual drivers. *Id*.

The Defense has further reviewed the "By Surge" data, which depicts the dollar value of surge rides taken by each individual driver on a month-by-month basis. *Id*. The "By Surge" sheet again demonstrates that a small proportion of the individual drivers were abusing Fake GPS, thereby accounting for a disproportionate amount of the Total Surge Value. For example, of the 632 individual drivers that stole surges using Fake GPS, a mere 16 individual drivers accounted for over one third of the Total Surge Value. Going further, over half of the Total Surge Value was accounted for by only 42 individual drivers, meaning that approximately 15% of the drivers accounted for over half of the Total Surge Value.

The Defense has also determined that 470 of the 632 drivers who stole surges never took more than $300 of surges in any given month. Effectively, this means that approximately 75% of

---

[7] The spreadsheet analyzed is Bates 53386, which is an earlier breakdown of the loss calculations with a $563,930.50 loss amount due to the falsely obtained surges on 50,133 rides.

the drivers never took enough surges in any given month to cover the cost of purchasing the defendants' Application for that month. This is a clear indication that a majority of the drivers were paying for the Application primarily for the legitimate functions it offered, namely the ability to see the destination of a prospective ride and approximate fare, and queue at the airport.

E.  Guidelines Calculations

Mr. Suarez objected to the U.S. Probation's Guidelines calculations. Specifically, the Defense objected to a 4-point USSG §3B1.1(a) leadership enhancement. If the Court agrees that Mr. Suarez does not qualify for the §3B1.1(a) enhancement, Mr. Suarez would qualify for a Zero Point Offender under USSG §4C1.1, making the Total Offense Level 18, rather than 24. Defense objections relating to this Guideline are:

10.[8] Paragraph 28 and 41 -  Defense respectfully objects to a four level leadership enhancement added pursuant to USSG §3B1.1(a). Mr. Suarez did not organize or lead any other participant with respect to the sole theory of wire fraud that Judge Ross' February 18, 2025 decision allowed the Government to proceed on. In order for this adjustment to apply, Mr. Suarez must have been an organizer, leader, manager, or supervisor of one or more other participants in the falsely claimed surge bonuses. The Background on USSG § 3B1.1 provides that this Guideline is meant to increase the offense level based upon (1) the size of the criminal organization, and (2) "the degree to which the defendant was responsible for committing the offense." Here, the only offense was the act of Screwber drivers spoofing their GPS location in order to steal surge bonuses that they did not rightfully earn. In order to determine whether Mr. Suarez organized or led at least one participant in the stealing of surge fares, it is necessary to analyze precisely what Mr. Suarez did and did not do in furtherance of the charged conspiracy.

Mr. Suarez's participation in the conspiracy is as follows: he developed and designed the suite of applications that enabled drivers to manipulate the rideshare company in ways that otherwise could not have been achieved without possessing the means or the knowledge necessary to bypass safeguards and he actively participated in managing and facilitating the continued operation of the suite of applications. He did not get a share of the profits from the falsely claimed surge bonuses.

---

[8] For consistency, Defense is using the objection numbers from the PSR Objections.

What Mr. Suarez did *not* do precisely what *is* required for this adjustment to apply. The suite of applications which Mr. Suarez developed, designed, managed and facilitated the continued operation of were designed by him to be utilized in a way which, according to the February 18 Decision, were entirely lawful purposes. The same application which allowed drivers to spoof their GPS location in order to steal surge fares, could be and was used for entirely lawful purposes, such as "queuing" at airports.

The Defense's position is that Mr. Suarez's *actual* participation in the offense itself (i.e. the stealing of surge bonuses) does not qualify as leading or organizing one or more participants.

12. Paragraphs 45 and 48  - In the event the Court agrees with Defense Objection 10 (relating to Paragraphs 28 and 42) regarding the inapplicability of the leadership enhancement, Mr. Suarez would be eligible for the 2 point reduction for Zero Point Offender under USSG §4C1.1, and the total offense level would be 18 (not 24).

18. Paragraph 86 - If the Court agrees with the Defense Objections 10 and 12 (relating to Paragraphs 28, 42, 45 and 48), the total offense level would be 18 and the guideline imprisonment range would be 27 to 33 months.

Defense respectfully urges the Court to hold that Mr. Suarez does not qualify for a leadership enhancement, but does qualify for a Zero Point Offender. Nonetheless, the Guidelines range of imprisonment, whether on Total Offense Level of 18 or 24 would be excessive in Mr. Suarez's case. The statutory goals of sentencing will be accomplished with five years of probation, which represents the statutory probationary maximum for the crime of conviction.

## V.   HISTORY AND CHARACTERISTICS OF MR. SUAREZ

Mr. Suarez never imagined that he would ever find himself as a defendant in federal court, where his esteemed adversary is the United States of America. That his oldest daughter, Laura, would need to cosign a bond in that federal court to get him released. That a Google search of his name would reveal press releases from the U.S. Attorney's Office and dozens of

articles linking him to a $40 million ride share fraud.[9] That he would be fired from his six-figure job at Cap Gemini after developing his professional reputation for nearly 30 years. That he would be making ends meet for his family by working 50-hours a week doing deliveries for DoorDash because no company will hire him after learning about his criminal case. That his wife, Adriana, would have to return to the workforce for the first time in decades, at 59-years-old, to work an entry-level call center job to get medical benefits and support their family with the little that she does earn. That selling his house would involve needing permission from the Forfeiture Unit at EDNY and that the entirety of his share would be going to partially satisfy a civil judgment. Yet, that is the reality that Mr. Suarez found himself in.

For most of his existence, Mr. Suarez led the life which many immigrants aspire to live. He married his college sweetheart, Adriana Maria Forero Duqe, who is now his wife of 31 years. PSR ¶62. They immigrated together from Bogota, Colombia to the United States on H-1B visas, with their three-year-old daughter Laura, who is now 28. They bought a house in Allendale, New Jersey. They had a second daughter, Daniela, who is now 20. They made a mutual decision that it was best for their family for Adriana to stay home and raise their daughters, with Mr. Suarez becoming the sole provider for the family. Despite carrying the financial burden for his family, Mr. Suarez attended his daughters' school events, encouraged them to pursue their interests, helped them with their homework, their college selection and taught them how to be kind and thoughtful people. Now, Laura and Daniela are both thriving in life due in large part to Mr. Suarez's parenting and his wife's sacrifice of staying at home to raise them.

Mr. Suarez's letter to the Court is annexed hereto as Defense Exhibit A.   In support of his personal history and characteristics, Mr. Suarez also submits letters from a collection of his

---

[9]https://nypost.com/2024/08/28/us-news/screwber-scheme-reaped-40m-in-bogus-surge-fares-for-hundreds-of-shady-uber-drivers-feds-say/ ("These Uber drivers took passengers for a $40 million ride.")

10

family, friends and members of his community, which are annexed hereto as <u>Defense Exhibit B</u>. Specifically, Ex. B comprises letters from:

- Adriana Maria Forero Duqe  (wife)
- Laura Suarez (daughter)
- Daniela Suarez (daughter)
- Claudia Viviana Suarez (sister)
- Rocio Giovana Suarez (sister)
- Javier Suarez (brother)

## VI.  THE STATUTORY GOALS OF SENTENCING ARE SATISFIED WITH A 60 MONTH PROBATIONARY SENTENCE

Under 18 U.S.C. § 3553(a)(2), the sentencing court is required to consider the need of the sentence imposed (a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (b) to afford adequate deterrence to criminal conduct; (c) to protect the public from further crimes of the defendant; and (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. For all the foregoing reasons, Mr. Suarez respectfully requests that this Court exercise its reasoned judgment and impose a sentence that is sufficient, but not greater than necessary to comply with the statutory objectives of sentencing, which the Defense submits is a sentence of 60-months probation.

Dated:  April 9, 2026
        New York, New York

Respectfully submitted,

Elena Fast, Esq.                              Michael S. Perkins, Esq.

11

The Fast Law Firm, P.C.
521 Fifth Avenue, 17 Floor
New York, New York 10175
Phone: (212) 729-9494
Email: elena@fastlawpc.com

The Fast Law Firm, P.C.
521 Fifth Avenue, 17 Floor
New York, New York 10175
Phone: (212) 729-9494
Email: michael@fastlawpc.com

*Counsel for Carlos Arturo Suarez Palacios*

cc: All counsel of record (via ECF)