

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JPL:DR/EL                                    *271 Cadman Plaza East*
F. #2023R00982                               *Brooklyn, New York 11201*

April 16, 2026

<u>By ECF</u>

The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    United States v. Carlos Arturo Suarez Palacios
<u>Docket No. 24-CR-329 (MKB)</u>

Dear Judge Brodie:

The government respectfully submits this letter in advance of defendant Carlos Arturo Suarez Palacios's (the "defendant" or "Suarez") sentencing, which is scheduled for Thursday, April 30, 2026, at 10:30 a.m. As described further herein, the defendant and his co-defendant Eliahou Paldiel ("Paldiel" and, together with the defendant, the "defendants") developed a suite of fraudulent applications designed to defraud rideshare companies, including Uber, by manipulating the companies' applications for the financial benefit of the defendants and the driver co-conspirators to whom they sold the fraudulent applications. As described herein, the scheme resulted in almost $1 million in loss.

In light of the seriousness of the offense, the government respectfully submits that a sentence within the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 51 to 63 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing. <u>See</u> 18 U.S.C. § 3553(a). The government also respectfully requests the Court order the defendant to pay a forfeiture money judgment in the amount of $366,000.00, as set forth in the Court's January 26, 2026 and February 20, 2026 orders of forfeiture, <u>see</u> ECF Nos. 68, 73, and order the defendant pay $959,900.74 in restitution, in accordance with the accompanying proposed restitution order.

I.    <u>Background</u>

The facts underlying the offense conduct in this case are set forth in the Presentence Investigation Report prepared by the United States Probation Department ("Probation") on March 24, 2026 (the "PSR") and the government's objections to the PSR, dated April 13, 2026 ("Gov. Obj"). ECF No. 81.

A.      Background on Rideshare Services

Rideshare services, also known as ride-hailing or transportation network services, are platforms that connect passengers with drivers for on-demand transportation.  PSR ¶ 10. Popular rideshare services include Uber and Lyft (the "Rideshare Companies"), who each have their own smartphone applications that users can download onto their smartphones to request rides (the "Rideshare Applications").  Id.  The rider's request within the application triggers a chain of events that results in a driver being dispatched to pick up the rider and transporting the rider to their selected destination.  Id.

To order a ride through Uber, the user must open the application, specify their desired location and request a ride.  Id.  Thereafter, Uber's application sends the ride request to nearby drivers, who may choose to accept the ride through the Uber application on their own cellular device.  Id. ¶ 11.  Once a driver accepts a ride on his or her Uber application, the driver will navigate to the user's location—which the Uber application tracks based on the rider's location and provides to the driver—and picks up the rider for transport to their destination.  Id. Payment is handled through the Uber application.  Id.  The rider's fare is calculated based on a variety of factors, including distance, time and demand, which, at times, also includes "surge pricing."  In areas of high ride demand, the price of an Uber ride may increase—or "surge"—in those areas.  Id.  Uber depends on its drivers' and users' accurate GPS location data to efficiently pair prospective riders with drivers, to assist its drivers in navigating riders to their destinations and accurately calculate fares, including the calculation of fare price surges, and to estimate user pick-up and drop-off times.  Id. ¶ 18.

Where fares are "surging," Uber offers surge fare payments to drivers who service rides picked up within surging geographical areas, to incentive drivers to service those high-demand areas.  Id. ¶ 12.  Drivers only receive a surge payment (in addition to their share of the base fare) if the ride pickup occurred within the surge zone and time frame.[1]  Id.

Typically, when a prospective passenger requests a ride through Uber, the driver receives a notification that a ride is available nearby and is prompted with an option to accept the ride.  Id. ¶ 13.  A key feature of Uber's service in New York City is that drivers do not receive certain information concerning the prospective ride, such as its destination or total fare, until after they accept the ride.  Id.

B.      The Fraudulent Rideshare Scheme

Between at least November 2018 and August 2024, the defendants engaged in an elaborate conspiracy to defraud Rideshare Companies by developing a suite of fraudulent applications (the "Fraudulent Applications"), which they sold to rideshare company drivers (the "Driver Co-conspirators").  The Fraudulent Applications enabled the Driver Co-conspirators to

---

[1]      Similarly, riders are only charged a surge fare if they request a ride within a surging zone during a surge time frame.  PSR ¶ 12.

manipulate the Rideshare Applications, allowing the drivers to enrich themselves by stealing surge fares and obtaining the most lucrative rides (the "Rideshare Scheme"). PSR ¶ 14.

### 1.      The Fraudulent Applications

The Fraudulent Applications enabled Driver Co-conspirators to, among other things, manipulate—or "spoof"—their GPS location within the Rideshare Applications, thereby allowing the drivers to (i) fraudulently obtain "surge" fares to which they were not entitled and (ii) "queue" in areas where the driver was not physically present, such as by placing themselves in taxi lines near airports or sporting events. PSR ¶¶ 14, 18. The Fraudulent Applications also enabled the drivers to cherry-pick high-fare rides by gaining access to information about prospective rides that was not available to other rideshare drivers. Id. ¶ 27, 31. The defendants sold the Fraudulent Applications to Driver Co-conspirators on manipulated—or "jailbroken"—cellular phones (the "Scheme Devices"). Id. ¶ 14, 16. Jailbroken phones allowed the defendants to install applications on the Scheme Devices that would otherwise not be permitted to be installed. See Gov. Obj. at 1.

The Fraudulent Applications consisted of the following applications:

- Screwber – Screwber is an application set up on the Driver Co-conspirators' personal cell phone through an application called Catapush. Catapush is a subscription-based push notification application that allows its customers to send (or "push") text messages out to a group of individuals. Through the Rideshare Scheme, drivers utilized Screwber to, prior to accepting a ride, receive information about a prospective Uber rider that is not otherwise available prior to accepting the ride, such as the rider's destination, and the approximate ride fare.

  Screwber only allowed a given Driver Co-conspirator to see such information for one prospective rider at a time, which information is "pushed" to the Catapush application on the driver's personal phone simultaneous to their receiving a prospective ride on the Rideshare Company application installed on the Scheme Device provided to them by the defendants (described further below). The information provided to Driver Co-conspirators via Screwber allowed them to selectively pick rides with lucrative ride prices. The defendants also used Catapush to provide updates to Driver Co-conspirators about the use of the Fraudulent Applications, including messages about resolving outages and using the applications in a way that avoided detection by the Rideshare Companies. PSR ¶¶ 15-16.

- Fake GPS – Fake GPS was an application that enabled Driver Co-conspirators to, among other things, manipulate or "spoof" their locations within the Rideshare Applications. This allowed them to, among other things, make it appear as if they were located in an area with surging fares when, in fact, they were not. In turn, Driver Co-conspirators were able to fraudulently obtain surge fares on rides to and from locations that were not actually "surging." Fake GPS also enabled Driver Co-conspirators to place themselves in airport

and event "queues" prior to the Driver Co-conspirators' arrival at the actual location, thereby reducing the time that the driver had to wait in the queue, i.e., "cutting" the line ahead of legitimately operating drivers.  PSR ¶ 18, Gov. Obj. at 1.

- Outdated Rideshare Application – Outdated versions of the Rideshare Application were downloaded onto the Scheme Devices provided to Driver Co-conspirators.  By installing outdated versions of the Rideshare Application, the defendants ensured that the Fake GPS and Screwber applications were not detected by security features implemented in newer versions of the Rideshare Application.  See Gov. Obj. at 1.

- Unc0ver – Unc0ver was the application used by defendant Paldiel to jailbreak the Scheme Devices, thereby allowing him to install the FakeGPS and Outdated Rideshare Application.  PSR ¶ 17.

- Luxzy.com – a website used by the defendants to manage updates to the Fraudulent Applications, payments from the Driver Co-conspirators, and the download of the Fraudulent Applications onto Scheme Devices.  PSR ¶ 19.

In furtherance of the Rideshare Scheme and in order to conceal it, the defendant subscribed to private cloud servers through a hosting provider, Ionos, to support the Fraudulent Applications.  Id. ¶ 20.  To conceal the Driver Co-conspirators' use of the Scheme Devices and Fraudulent Applications from the Rideshare Companies, Suarez configured the Scheme Devices to access the Rideshare Companies' applications using internet protocol ("IP") addresses assigned by and routed through the private cloud servers, which IP addresses they often changed or "rotated out" in order to avoid detection by the Rideshare Companies.  Id. ¶¶ 18, 27.  For example, in an October 2020 exchange, Paldiel discussed with Suarez whether a Driver Co-conspirator's "deactivation" would "lead Uber to [the defendants]" and that the defendants

4

"should be covering [their] tracks."  Suarez indicated that the "proxy address [for the Fraudulent Applications] Uber doesn't see .. they see our servers and I do weekly rotation of IPs."



The government identified over 900 Driver Co-Conspirators who used the Fraudulent Applications for rides obtained through Uber through the Rideshare Scheme. See Gov. Obj at 1-2.

2.    Scheme Proceeds

The defendants typically sold the Scheme Devices to Driver Co-conspirators for $600 and charged the drivers a monthly subscription fee of $300 for the continued use of the Fraudulent Applications.  PSR ¶ 21.  From December 2019 through September 2023, Paldiel had approximately $118,000 in outgoing transactions with payment memos, such as: "Fake GPS," "monthly uber booster," "screwber," and "gps license."  Id.  In total, from approximately January 2019 to December 2023, Paldiel received over 7,000 payments through money transfer platforms Zelle, Venmo, and CashApp that appeared to relate to the Rideshare Scheme.  Id. ¶ 23.  These payments were sent monthly from individuals who, based on the amount of the payment and accompanying "payment memos," appear to be Driver Co-conspirators using the Fraudulent Applications.  Id.

After Paldiel received payments from these individuals, Paldiel sent approximately half of each payment to Suarez.  Id.  From February 2020 through December 2023, Suarez received approximately $733,562.22 from Paldiel's CashApp account.  Id.  Descriptions in the payment memos for these payments include: "monthly screwber", "server catapush google bruce domain renewal," "server google catapush" among others, evidencing that the payments were associated with and in furtherance of the Rideshare Scheme, which were shared between the defendants.  Id.  In most instances, these payments included the sender's (the suspected Driver Co-conspirator's) name in the memo section of the payment to Suarez.  Id. ¶ 23.

### 3.    The Defendants' Roles

The defendants each played distinct, but coordinated, roles in leading the Rideshare Scheme.  Id.  Namely, Paldiel was the face of the scheme and recruited Driver Co-conspirators, to whom he sold the suite of Fraudulent Applications, while Suarez—an application developer—designed and maintained the Fraudulent Applications to ensure they remained operational and undetected.  PSR ¶¶ 28, 31, 32.  The defendants also coordinated with each other to send updates and messages to Driver Co-conspirators about the use and functionality of the Fraudulent Applications, including messages to alert the Driver Co-conspirators that they needed to take precautionary measures to avoid detection.

Paldiel sold jailbroken Scheme Devices to Driver Co-conspirators that were equipped with the Fraudulent Applications and configured the drivers' personal phones to receive Catapush notifications, as described above.  PSR ¶ 32.  In addition to meeting with Driver Co-conspirators to help set up their various devices, Paldiel would also meet in-person with Driver Co-Conspirators to troubleshoot issues with the Fraudulent Applications.  For example, in a December 2018 communication with Suarez, Paldiel indicated that he was meeting up with a driver to troubleshoot his version of the Fraudulent Applications because a different version was routinely crashing.  In the same conversation, the defendants discussed that they

needed to raise the subscription price for the Fraudulent Applications because Driver Co-conspirators were profiting extensively by using the applications.

```
From:              Eli Paldiel (owner)
Timestamp: 12/13/2018 6:32:02 PM(UTC+0)
Source App: Apple iCloud Backup
Body:
Mohammed went from making 2000/week to 3000/week thanks to Carlos&Eli INC
----------------------------
From:              C
Timestamp: 12/13/2018 6:32:14 PM(UTC+0)
Source App: Apple iCloud Backup
Body:
😂 😂
----------------------------
From:              C
Timestamp: 12/13/2018 6:32:46 PM(UTC+0)
Source App: Apple iCloud Backup
Body:
Need to rise those prices! We are leaving too much on the table if that's the case!
----------------------------
From:              Eli Paldiel (owner)
Timestamp: 12/13/2018 6:32:58 PM(UTC+0)
Source App: Apple iCloud Backup
Body:
The rider asked him if it was OK to go far to CT Mohammed asked if he could do cash because of the long empty ride back Rider said OK
----------------------------
From:              C
Timestamp: 12/13/2018 6:33:24 PM(UTC+0)
Source App: Apple iCloud Backup
Body:
ScreWber is worth $500 a month then! Haha
----------------------------
From:              Eli Paldiel (owner)
Timestamp: 12/13/2018 6:33:53 PM(UTC+0)
Source App: Apple iCloud Backup
Body:
Im getting his iPhone 6 today for testing Uber V1.3. my version 1.4 crashes all the time had to reopen the app like 5 times during my trip
```

Suarez was primarily tasked with developing and maintaining the Fraudulent Applications. PSR ¶¶ 27-28. Specifically, Suarez designed the Fraudulent Applications and ensured that the applications successfully circumvented the operational safeguards built into Rideshare Companies' applications, thereby allowing Driver Co-conspirators to steal surge fares. Id. Suarez, together with Paldiel, corresponded with an individual in China named "Joe Bruce" about troubleshooting the Fraudulent Applications and creating features within the Fraudulent Applications that enabled Driver Co-conspirators to successfully defraud Rideshare Companies. Id. ¶¶ 25, 27-28. For example, in a June 2022 email, Suarez (copying Paldiel) contacted Bruce for assistance updating FakeGPS because Uber had detected the defendants' GPS application and was blocking Driver Co-conspirators from spoofing their location. In his communications with Bruce, Suarez discussed that the application was being detected by Uber and further indicated "I guess if we want to completely disguise the app then EVERYTHING related needs to be rename to never use the keywords "gps" or "fake"?



发件人: Carlos Suarez
发送时间: 2022年6月28日 18:26
收件人: bruce joe
抄送: Eli Paldiel
主题: Re: Uber app detecting GPS Operator is installed

Hi Bruce .. tested 1.9.6.8 but still the same. It is being detected.

I guess if we want to completely disguise the app then EVERYTHING related needs to be rename to never use the keywords "gps" or "fake"? I mean, including the app name, any libraries, folders, etc.. anything you can think can be being programmatically searched for and/or related by another app. I know it's probably a lot of work but only that way we can rule out completely if that's how it is being detected before trying other things.

As another example, in an April 2022 email chain, Paldiel (copying Suarez) contacted Bruce seeking assistance in adding a feature within FakeGPS to allow drivers to more efficiently steal surge fares:

> So lets make a new button below the button "Drive back to the real location" we can call this new button "Drive back to a favorite location" So the driver will fake himself somewhere on the map, then he will click "drive back to a favorite location" the favorite list will pop up and the driver will select a favorite location from the list of his favorite locations . . . This new feature will allow a driver to fake himself in Manhattan, pick up a bonus and drive it to JFK airport in the waiting lot all while being in New Jersey on his way back.

(emphasis added). In response, Suarez responded with suggestions on how to streamline the new feature, which Bruce subsequently indicated he implemented in a new version of FakeGPS. Portions of the above-referenced email chain are included below:

**From:** Eli Paldiel ◄
**Subject:** Re: New Feature Drive back to favorite location
**Date:** April 20, 2022 at 11:59:07 PM EDT
**To:** Bruce ◄joebruce

So lets make a new button below the button "Drive back to the real location" we can call this new button "Drive back to a favorite location"
So the driver will fake himself somewhere on the map, then he will click "drive back to a favorite location" the favorite list will pop up and the driver will select a favorite location from the list of his favorite locations. The app will then draw a straight line between the fake location and the favorite location (straight line or route) just like we already do on drive back to real location. The car will now drive from the fake location to the favorite location, speed setting can be altered just like we have on Drive back to real location using the pause play button.
I guess you can use the same exact program we have "drive back to real location" except instead of driving to the real location from the fake location the favorite list will open and the driver can chose a favorite location to drive to from the fake location. The car will always start from the fake location to the favorite location just like it does on Drive back to the real location, basically we are replacing the real location with a favorite location in the driver list, you know the list of favorite location on the bottom of the app button.

The reason why some drivers want this feature is because sometimes they are far away from the airport, they could be in New Jersey after dropping off a passenger from New York now they are heading back to New York back to JFK airport. While on the way back a nice Bonus pops up in Manhattan, but the driver wants to fake himself in the airport at JFK so he can get in line for the next ride since you can wait hours in the airport queue to get a ride. This new feature will allow a driver to fake himself in Manhattan, pick up a bonus and drive it to JFK airport in the waiting lot all while being in New Jersey on his way back.

发件人: Carlos Suarez
发送时间: 2022年4月21日 19:13
收件人: bruce joe <joebruce               Eli Paldiel
主题: Re: New Feature Drive back to favorite location

A better solution to avoid adding too many buttons to the screen is to use the same "Drive back to real location" button and rename it as "Drive to", then when they click pop-up the list of favorite locations but always include at the top as first option "My real location" and then the list of favorite locations they have saved. That way is one single button and when clicked they can choose their real location or a location they have saved before.

8

In certain instances, Suarez also communicated directly with Driver Co-conspirators about the Rideshare Scheme, including about the functionality of the Fraudulent Applications.

In addition to the conduct described above, Paldiel and Suarez worked together to send updates to Driver Co-conspirators via Catapush about the operation of the Fraudulent Applications, including information about updates to the Fraudulent Applications and how to use the Fraudulent Applications in a manner to avoid detection. Id. ¶ 32. Specifically, text messages between the defendants revealed that they coordinated with one another about whether and when to send messages to Driver Co-conspirators via Catapush. For example, in a March 2023 text exchange, Paldiel sent Suarez a draft Catapush message warning drivers that using FakeGPS to "steal[] surge, bonus from far away is extremely risky" and asked Suarez if he should "send [the] warning," to which Suarez replied "[y]eah good idea." In a May 2020 exchange, Suarez indicated to Paldiel that he would "send [a] Catapush message later to everyone" about updates that needed to be made to the Fraudulent Applications. Later, Paldiel sent a draft message to Suarez detailing instructions on how Driver Co-conspirators could install the relevant updates, which Suarez indicated he sent to the drivers. Other examples of updates the defendants sent to the Driver Co-conspirators are included below:

- On January 10, 2024 the defendants sent a message through Catapush stating "***Activity Update***  JFK – Busy." Shortly thereafter, another message was sent stating "To all Uber drivers, we would like to remind you that stealing bonus, surge with FakeGPS is very high risk. A few drivers in Philadelphia were deactivated while doing Uver [sic?] Eats, and using FakeGPS for bonus. We had no deactivations in New York for taking bonus with FakeGPS but we still feel that it is high risk and you should be aware."

- On April 2, 2024, the defendants sent the following  message through Catapush: "We are asking drivers not to text and call for now, this is going to take some time. I will post updates on Catapush about the future of our programs, I will leave Catapush open for all drivers to receive updates and news. For now Lyft is blocking my server, we are trying to see if there is a way to connect to Lyft without being caught. We are testing a new stradegy [sic] with Lyft right now so far its been working but its way too early to tell if this will last. Uber has totaly [sic] changed their code language for this reason older versions of Uber that only work on IOS 14 can no longer work. We know how to jailbreak IOS 15 and IOS 16. We are looking for Uber accounts to practice and test our program and make sure the Uver [sic?] account will be safe. This can take time. One thing we know for sure, the only way to move forward is to get IOS 15 and IOS 16 to work and that is what we are doing right now."

- On April 6, 2024 the defendants sent the following message:



C. The Defendants' Criminal Intent

The defendants routinely discussed the illegal nature of the Rideshare Scheme. For example, in a July 2020 conversation, Suarez indicated to Paldiel, "[j]ust remember once you're in jail for racketeering, money laundry, mail fraud, tax evasion and all the shit I won't be able to Venmo you any [m]ore [laughing face emoji]." The following day, the two discussed whether they should pay taxes on Rideshare Scheme proceeds to avoid detection by the IRS, during which conversation Paldiel indicated that "the IRS only really looks into account that have 150K and up of earnings." In a subsequent conversation in March 2021, Suarez indicated that the defendants "have to find how to hide this money better lol … ever time I'm doing my taxes it bites hard my ass lol … im not reporting it this time." Paldiel responded "Unemployment and Lyft is all they are getting this year" (thereby not reporting income from the Rideshare Scheme).

In a November 2018 conversation, Suarez advised Paldiel that he should "warn[] everyone" that the Rideshare Scheme could end at a "moments notice" if "Uber or Lyft figure[d] something out." Suarez further stated that "the moment I smell trouble I'll shut down everything and fly back to mother land [laughing emoji]," indicating that he would flee if the defendants were ever caught.

Paldiel and Suarez often communicated about selling the Fraudulent Applications to Driver Co-conspirators. In a November 2018 message to Paldiel, Suarez indicated "You know ScreWber is like drugs .. once you get into it you'll get withdrawals when you can't get your fix [laughing face emoji] … You feel like the worse whore in the street without it lol … ScreWber g[i]ves you high end call girl status LOL." A few weeks later, Paldiel wrote to Suarez: "I get them hooked on the software, even a drug dealer throws in a few extra grams of weed in the beginning," bragging about how lucrative the Fraudulent Applications were to Driver Co-conspirators and comparing their product to drugs and themselves to drug dealers.

The defendants also routinely discussed the Driver Co-conspirators' use of the Fraudulent Applications to steal surge fares. In an August 2020 communication, the defendants

10

discussed that they were "robinhood" figures, "taking from the rich … and giving it to the poor." Paldiel indicated that Robin Hood "was still a criminal so I'm not sure how that would save us lol." Suarez replied that "[i]t won't lol." Indeed, the defendants mocked the harm that the Rideshare Scheme caused to Uber. Images seized from Paldiel's iCloud account show that Paldiel possessed "memes" depicting Uber's CEO, with captions indicating "[w]hy so many fucking drivers stealing my surge?" and "[w]ho the fuck is stealing all my surge in New York, New Jersey and Philadelphia?" In each of the images, a screenshot of FakeGPS is shown "spoofing" a driver's location.



11



In a December 2020 message to an individual that appears to be a Driver Co-conspirator, Paldiel stated "I hope before I am done with Uber that I have cause[d] millions in damage to them, I consider them Satanic no regret … [i]f I could make them go Bankrupt my life would have meaning."

D.    Losses to Uber

As described above, the government identified over 900 unique Driver Co-conspirators who used the defendants' Fraudulent Applications to manipulate Uber's application. The government further identified over 90,000 rides—accepted by over 600 unique Driver Co-conspirators—whose location data was consistent with spoofing and for which Uber paid the Driver Co-conspirators a surge fare to which the driver was not otherwise entitled. Gov. Obj. at 1-2. As a result of the stolen surge obtained by the Driver Co-conspirators, Uber suffered a loss of $959,900.74. Id.; see also PSR ¶¶ 26, 30, 34, 95.

E.    Procedural History

On August 8, 2024, a grand jury sitting in the Eastern District of New York returned a two-count indictment charging the defendants with (i) conspiracy commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One) and (ii) money laundering conspiracy, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (Count Two). ECF No. 1 (the "Indictment").

On November 27, 2024, Paldiel filed a motion to dismiss the charges in the Indictment, arguing, among other things, that Count One was not viable because it did not allege that the defendants intended to harm "traditional property interests," as required under Ciminelli v. United States, 598 U.S. 306 (2023). ECF No. 36. On February 18, 2025, the Honorable Allyne R. Ross, District Court Judge for the Eastern District of New York, issued an order partially dismissing Count One and limiting the government's prosecution to the defendants' "scheme to deprive Uber of money in the form of fraudulently obtained surge fares." ECF No. 48 at 31-32.

12

On May 22, 2025, Judge Ross issued an order following the Supreme Court's decision in Kousisis v. United States, 605 U.S. 114 (2025), noting that the decision "likely abrogates long-standing circuit precedent on fraudulent inducement theories of wire fraud and the 'benefit of the bargain' analysis," and therefore may have affected the Court's prior ruling limiting the government's theory of the case that the "line-cutting" and cherry-picking" aspects of the Fraudulent Applications' also defrauded Uber (and its drivers and riders) of its property. Minute Entry dated May 22, 2025.  Accordingly, the Court ordered the parties to brief the impact of Kousisis on the Court's prior opinion.  Id.  The parties reached a resolution in advance of continued litigation on this issue.

On October 7, 2025, the defendant pleaded guilty to Count One of the Indictment, pursuant to a plea agreement with the government.  ECF No. 64.  In his plea agreement, the defendant stipulated to causing at least $959,900.71 in losses connected to surge fares stolen from Uber through the Driver Co-conspirators' use of the Fraudulent Applications.[2]  The defendant also stipulated to a forfeiture money judgment in the amount of $366,000 and restitution in the amount of $959,900.74.

## II. Applicable Law

The Supreme Court has explained that a "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).

Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the court] may not presume that the Guidelines range is reasonable.  [The court] must make an individualized assessment based on the facts presented."  Id. at 50 (citation and footnote omitted).  Specifically, 18 U.S.C. § 3553(a) requires that, in imposing a sentence, a court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—

---

[2]    The parties agreed to resolve the charges in the Indictment based on loss amounts connected to surge fares stolen from Uber.  Nonetheless, the government submits that the Supreme Court's holding in Kousisis supports the government's broader prosecution theory, including that the Fraudulent Applications' "line-cutting" and "cherry-picking" features defrauded Uber, its riders and its drivers.  The government disagrees with the defendant's characterization throughout his sentencing memorandum that any use of the Fraudulent Applications for non-spoofing purposes constitutes "legal" use of the applications.  See ECF No. 78 ("Def. Memo") at 9.  At a minimum, that issue has not been decided and the host of Fraudulent Applications may be considered by the Court at sentencing.

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

III.    Analysis

A.    Sentencing Calculation

The government agrees with the Guidelines Offense Level calculated in the PSR, which is as follows:

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | | 7 |
| Plus: | Loss Exceeded $550,000 (U.S.S.G. § 2B1.1(b)(1)(H)) | +14 |
| Plus: | Sophisticated Means (U.S.S.G. § 2B1.1(b)(10)(C)) | +2 |
| Plus: | Aggravating Role (U.S.S.G. § 3B1.1(a)) | +4 |
| Less: | Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)-(b)) | -3 |
| Total: | | 24 |

PSR ¶¶ 37-48. The defendant is in criminal history category I. Id. ¶ 52. Accordingly, the applicable Guidelines range is 51 to 63 months' imprisonment. Id. ¶ 86.

In his plea agreement, the defendant stipulated to the above Guidelines calculation but challenges the four-level leadership enhancement under U.S.S.G. § 3B1.1(a). See Def. Memo at 8-9. The government, with whom Probation agrees, submits that the four-point leadership enhancement appropriately considers the defendant's role as one of the two leaders and organizers of the Rideshare Scheme. U.S.S.G. § 3B1.1(a) mandates a four-level

14

enhancement in offense level for a defendant who is "an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive." United States v. Paccione, 202 F.3d 622, 624 (2d Cir. 2000).  Whether a defendant is a leader depends on "the degree of discretion exercised by him, the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy."  Id. (quoting United States v. Beaulieau, 959 F.2d 375, 379-80 (2d Cir.1992)); see also U.S.S.G. § 3B1.1 cmt. n.4 ("Factors the court should consider include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.").

The defendant cannot seriously dispute that he, together with Paldiel, were the founders and organizers of the Rideshare Scheme.  Indeed, in one communication between the defendants, Paldiel indicated to the defendant that they were "partners," and that Paldiel was doing "all the street work."  The defendant responded "[t]hat was your end of the deal and I put the time keeping all up and running and updating and you put in the street work didn't we agree on that?"  The evidence of the Rideshare Scheme shows that is exactly what was agreed to: a partnership between Paldiel, who recruited the Driver Co-conspirators, and Suarez, who managed the Fraudulent Applications, with the two defendants splitting the proceeds.  Specifically, the defendant was tasked with creating and supporting the Fraudulent Applications, including by conspiring with Paldiel and Joe Bruce about the Fraudulent Applications' functionality and features.  The defendant also subscribed to Catapush and Ionos in order to ensure the functionality of the applications, which subscription costs he shared with Paldiel, his partner.

In arguing that he is not an organizer of the offense, the defendant primarily argues that he did not lead anyone through his position as the developer of the Fraudulent Applications and that he did not get a share of the Driver Co-conspirators' profits.  Def. Memo at 8-9.  This argument is without merit and misstates the law and facts.

First, the defendant conspicuously ignores that a four-level enhancement is appropriate where the defendant is an organizer and where the offense is "otherwise extensive."  See U.S.S.G. § 3B1.1(a).  In "assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered."  U.S.S.G. § 3B1.1(a) cmt n.3.  Indeed, the commentary specifically provides that even "a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."  Id.  Here, the Rideshare Scheme involved the defendants' recruitment of hundreds of Driver Co-conspirators—knowing participants in the fraud—with whom the defendants communicated extensively about the Rideshare Scheme in order to facilitate the drivers' theft of fraudulently obtained surge fares.  Indeed, as described above, the defendants coordinated updates that they would provide to the Driver Co-conspirators via Catapush to assist them in avoiding detection and advise them on how to use the Fraudulent Applications.  There is no credible argument that the defendant was not an organizer of the Rideshare Scheme and led the Driver Co-conspirators with whom he worked.

The defendant's contention that he did not share in the drivers' profits is also uncompelling.  As described above, the defendants charged monthly fees to allow Driver Co-

15

conspirators to use the Fraudulent Applications and, in at least one instance, discussed raising the monthly fees as a result of the drivers' increased profits from using the Fraudulent Applications. The defendants' profit incentives were directly tied to that of the Driver Co-conspirators they worked with to defraud the Rideshare Companies—if the Driver Co-conspirators did not make money from the Scheme, they would no longer continue purchasing the Fraudulent Applications and that meant the defendant wouldn't be lining his own pockets.

The defendant was clearly a leader and organizer of the Rideshare Scheme and the Court should apply the four-level enhancement under U.S.S.G. § 3B1.1(a).

### B.     A Guidelines Sentence of 51 to 63 Months' Imprisonment is Appropriate

For the reasons set forth below, the government submits that a Guidelines sentence of 51 to 63 months' imprisonment is appropriate.

### 1.     Nature and Circumstances of the Offense

The Court's sentence must reflect the nature and circumstances of the defendant's offense. See 18 U.S.C. § 3553(a)(1). Here, the Court's sentence should account for the scale, sophistication and premeditation of the fraud. The defendants worked together to orchestrate a scheme with hundreds of Driver Co-conspirators to defraud Uber and other Rideshare Companies. Working together, the defendants took numerous steps to ensure the success of their Scheme, including by using anonymous servers to avoid detection, providing the Driver Co-conspirators' with jailbroken phones to prevent the Rideshare Companies from more easily detecting their fraud, and by constantly updating the Fraudulent Applications to avoid detection by the Rideshare Companies. Through their hard-work and commitment to keeping the Fraudulent Applications up and running for years, the defendants caused almost one million dollars in loss to Uber in order to enrich themselves.

The defendant's characterization of the harm as one created because the Driver Co-conspirators "misused and abused" the Fraudulent Applications he designed, marketed and sold, demonstrates no understanding of the defendant's premeditated conduct, leading role in the offense, or greed. See Def. Mem. at 7. The government identified over 600 drivers who used the Fraudulent Applications exactly the way the defendants intended—to steal from Uber to line their own pockets. This wasn't an example of one or two rogue drivers using the Fraudulent Applications in ways the developer didn't intend. The defendants consistently and proactively counseled drivers—e.g., through "push" notifications—on ways to avoid detection; and the explicit manner in which the defendants discussed the Fraudulent Applications speaks volumes to the defendant's intent. Indeed, as detailed above, the defendants specifically discussed ways in which they could improve FakeGPS so that Driver Co-conspirators could most effectively obtain stolen surge fares, precisely as the defendants intended. This greed-driven criminal conduct warrants serious punishment.

### 2.     History and Characteristics of the Defendant

The Court must also consider the defendant's "history and characteristics." 18 U.S.C. § 3553(a)(1). Unlike many of the defendants who appear before this Court, the defendant had many advantages in his life—he grew up with a supportive family and attended college,

16

receiving a Bachelors Degree in computer science.  Up until his arrest for the current case, the defendant was a full-time engineer at Capgemini.  However, instead of using his educational training to live a law-abiding life, and being satisfied by his gainful employment, the defendant chose to use his technical training to make money through fraud.  This is evidenced by the defendant's brazen attitude to his crime—calling the application "Fake GPS" and "Screwber" and explaining to his co-defendant that as soon as he thinks he is going to get caught for what he is doing ("smell trouble") he is going to flee the country ("I'll shut everything down and fly back to the mother land [laughing emoji]."

Further, the defendant's efforts to shift blame from himself to his victim, with whom he expressed dissatisfaction in his sentencing memo, only underscores the frivolity to which he ascribes his behavior.  See Def. Memo at 5.  Vigilante justice is not accepted in our system, nor should the defendant be rewarded for working outside the confines of the law—not to mention Uber's contractual agreements with their employees—to serve what he deems to be an effort to improve the quality of life for Uber drivers.  The defendant's effort to characterize his criminal activity as one of valor on behalf of the unrepresented Driver Co-conspirators is belied by the defendants' statements to the contrary when discussing the Fraudulent Applications.  The defendant knew the harm he was committing, and it was harm that he intended—the defendants believed themselves to be Robin Hood, stealing from the rich, but knowing in the end that any comparison to Robin Hood, who was a criminal himself, wouldn't save them.  This was plainly a crime driven by greed rather than necessity and intended to inflict harm, a fact that the Court should give great weight when crafting a sentence.

3.    The Seriousness of the Offense, Respect for the Law and Just Punishment

The need for the sentence "to reflect the seriousness of the offense," "to promote respect for the law," and "to provide just punishment," 18 U.S.C. § 3553(a)(2), also weighs in favor of a Guidelines' sentence.  As detailed above, the defendant's conduct evidences no respect for the law and instead a desire not only to break it, but inflict the harm he knew he was causing.  The defendant's attitude towards his crimes shows how unserious he views his actions.  A substantial sentence is necessary to demonstrate that the defendant is not above the law.

4.    General and Specific Deterrence

The Court must also impose a sentence that will deter the defendant and others from criminal conduct in the future.  See 18 U.S.C. § 3553(a)(2)(B).  A sentence within the Guidelines range will act to deter the defendant, and others similarly situated, from engaging in similar fraud in the future.  It is important that the Court's sentence send a message to would-fraudsters that this type of behavior is not one to be glorified—you are not acting as Robin Hood and redistributing wealth to the impoverished, but violating federal law in an effort to line your own pockets.

As the defendant's conduct demonstrates, white-collar criminals are capable of weighing risk and reward; they act deliberately and are therefore susceptible to deterrence if the consequences are severe enough.  See United States v. Blech, 550 F. App'x 70, 71 (2d Cir. 2014) (summary order) ("Blech was sentenced based on the 18 U.S.C. § 3553(a) factors, including the need for specific deterrence for a recidivist, and the need for general deterrence for those who

might otherwise feel that some white-collar crimes are 'game[s] worth playing.'") (quoting United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013)); S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense.  This is particularly important in the area of white collar crime.  Major white collar criminals often are sentenced to small fines and little or no imprisonment.  Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.").

To ensure crime doesn't pay, the consequences of getting caught must be significant.  See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties").  Because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."  See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After Booker, 47 WM. & MARY L. REV. 721, 724 (2005)) (internal quotation marks omitted); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.");  Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. OF POLITICAL ECON. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime.  This corroborates the theory of general deterrence.").  This is especially true where, as here, the fraudulent scheme is especially complex, difficult to detect and unravel, and the defendants effectively operated the scheme as a criminal business venture.

IV.    Restitution

A.    Applicable Law

Restitution may be ordered for losses caused by an offense of conviction, United States v. Cadet, 664 F.3d 27, 34–35 (2d Cir. 2011), and when authorized by statute, United States v. Helmsley, 941 F.2d 71, 101 (2d Cir. 1991).  The Mandatory Victim Restitution Act of 1996 ("MVRA") provides for mandatory restitution for offenses "committed by fraud or deceit" in which "an identifiable victim" has suffered "pecuniary loss."  18 U.S.C. § 3663A(c)(1).  In such case, the district court must order restitution "in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."  Id. § 3664(f)(1)(A).

"Because the purpose of restitution is essentially compensatory, and because the MVRA itself limits restitution to the full amount of each victim's loss, a restitution order must be tied to the victim's actual, provable loss."  United States v. Zangari, 677 F.3d 86, 91 (2d Cir. 2012) (internal quotation marks and citations omitted).  The "calculation of these losses need not be mathematically precise."  See United States v. Rainford, 110 F.4th 455, 490 (2d Cir. 2024) (quoting United States v. Rivernider, 828 F.3d 91, 115 (2d Cir. 2016) (internal quotation marks omitted).  The district court need make only a "reasonable estimate" of the loss "based on the

evidence before it." See Rainford, 110 F.4th at 490 (quoting United States v. Milstein, 481 F.3d 132, 137 (2d Cir. 2007)). These losses must be awarded to a victim as restitution when the victim's losses are the direct and proximate result of the offense of conviction. See 18 U.S.C. § 3663A(a)(2); United States v. Reifler, 446 F.3d 65, 135 (2d Cir. 2006).

In cases involving multiple defendants, the MVRA provides that the sentencing court discretion to "make each defendant liable for payment of the full amount of restitution or apportion liability among the defendants…." 18 U.S.C. § 3664(h). Nonetheless, the Second Circuit has "long recognized that an order imposing full restitution on multiple participants in a single crime will normally be deemed to impose 'joint and several' liability." See United States v. Yalincak, 30 F.4th 115, 122 (2d Cir. 2022); see also United States v. Nucci, 364 F.3d 419, 422 (2d Cir. 2004) (emphasis added). Joint and several liability is the standard rule because it serves the interests of the injured victim by allowing the "government (acting for the benefit of the victim)" to "collect from either defendant until the victim [is] made whole." Yalincak, F. 4th at 123. In that way, joint and several liability also comports with the directive of the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, which entitles victims to "full and timely restitution," § 3771(a)(7), and instructs the government—as well as the Court—to ensure that crime victims are "afforded the rights described" therein, § 3771(b)(1) & (c)(1).

    B.    Analysis

The surge losses suffered by Uber are the direct and proximate result of the defendants' Fraudulent Applications. Accordingly, and in accordance with the plea agreement between the parties, the government requests that the Court impose restitution in the amount of $959,900.74. The government further requests that restitution be imposed jointly and severally between the defendants, in connection with the surge losses described above, and in accordance with the accompanying proposed restitution order. See Ex. A[3]; see also Yalincak, 30 F.4th at 122. As described above, the defendants were co-organizers of the Rideshare Scheme and should be jointly and severally liable for all losses caused by their criminal conspiracy.

    V.    Forfeiture

The government also respectfully requests that the Court order the defendant to pay a forfeiture money judgment in the amount of $366,000.00, as set forth in the Court's January 26, 2026 and February 20, 2026 orders of forfeiture and as agreed to in the plea agreement. See ECF Nos. 68, 73.

---

[3]    The government further requests that the Court accept Exhibit A, which includes victim identifying and contact information, under seal. See 18 U.S.C. § 3771(a)(8) (providing that victims have the right to be treated "with respect for the victim's dignity and privacy") (emphasis added); see also United States v. Starr, No. 10-CR-520 (SAS), 2011 WL 1796340, at *1 (S.D.N.Y. May 2, 2011) (sealing victim impact letters and finding that the privacy interests of victims outweighed the public's right to access judicial documents, citing 18 U.S.C. § 3771(a)(8)).

VI.     Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a term of imprisonment of 51 to 63 months, impose restitution in the amount of $959,900.74 and order forfeiture in the amount of $366,000.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:     /s/ Dana Rehnquist
        Dana Rehnquist
        Elias Laris
        Assistant U.S. Attorney
        (718) 254-6029

cc:     Clerk of the Court (MKB)
        United States Probation Officer Cheyanne Ralph
        Counsel of Record (by ECF)

20